# Exhibit A

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,      : 24-CR-50(HG)
 4                                  :
                                    :
 5                                  :
          -against-                 : United States Courthouse
 6                                  : Brooklyn, New York
                                    :
 7                                  :
                                    : Monday, September 9, 2024
 8   JOHN RAGANO,                    :
                                    :
 9           Defendant.             :
                                    :
10   - - - - - - - - - - - - - - - - - X
```

        TRANSCRIPT OF CRIMINAL CAUSE FOR PRETRIAL CONFERENCE
                BEFORE THE HONORABLE HECTOR GONZALEZ
                    UNITED STATES DISTRICT JUDGE

                      A P P E A R A N C E S:

For the Government: BREON S. PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  DEVON LASH, ESQ.
                    ANDREW D. REICH, ESQ.
                    Assistant United States Attorneys

 For the Defendant:   LAW OFFICES OF JOEL M. STEIN, ESQ.
                    30 Wall Street, 8th Floor
                    New York, New York 10005
                BY: JOEL M. STEIN, ESQ.

For the Defendant:    ZEMAN & WOMBLE, LLP
                    20 Vesey Street, Room 400
                    New York, New York 10007
                BY:   ARTHUR K. WOMBLE, ESQ.

Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
                 E-mail:  NSestaRMR@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

1          (In open court.)

2          THE COURTROOM DEPUTY:  Criminal cause for a pretrial

3     conference docket 24-CR-50, United States of America versus

4     Ragano.  Parties please state your appearances for the record,

5     starting with the government.

6          MS. LASH:  Good morning, Your Honor.  Devon Lash,

7     Andrew Reich for the United States.  And we're joined at

8     counsel table by Paralegal Specialist Kristina Kim and Special

9     Agent Joseph Costello of the FBI.

10         THE COURT:  Good morning.

11         MR. STEIN:  I would say good morning but it might

12    sound sarcastic given this morning's events.  But good

13    morning, nevertheless, Joel Stein for Mr. Ragano.

14         THE COURT:  All in a day's work, Mr. Stein.

15         MR. WOMBLE:  And good morning, Your Honor.  Ken

16    Womble on behalf of Mr. Ragano.

17         THE COURT:  Good morning, Mr. Womble.  Obviously I

18    heard from the parties that there was something or some reason

19    why Mr. Ragano was not transported from the MDC.

20         Is there further update on that from the government?

21         MS. LASH:  Yes, Your Honor.  The government noticed

22    that Mr. Ragano was not on the production request on Friday

23    afternoon and put in a request for his production, albeit past

24    the marshal's deadline.  We confirmed that through an email

25    and a phone call and understood that he would be here this

*Proceedings*      3

1   morning.

2        We learned this morning that he was not included on

3   the list and was not produced.  To the extent that it was our

4   fault for the late request, we apologize to the defense and

5   the Court for the inconvenience.

6        THE COURT:  All right.  My plan in today's

7   conference is to go through and give you my rulings on the in

8   limine motions.  So it's discussing questions of law.  So

9   under Rule 43 I'm within my authority to go forward but I'll

10   hear from you, Mr. Stein.

11        MR. STEIN:  Judge, I understand that if they relate

12   to a legal matter, we can proceed without our client being

13   here.  My preference, for what it's worth, is that he be here.

14        THE COURT:  Yes, look, calendars being what they

15   are, I want to give you these rulings.  I could easily just go

16   back and type out some text orders and we'd be in the same

17   place.  But I think it's probably better just to hear it and

18   have a little context around the rulings, so I'm going to go

19   forward.

20        MR. STEIN:  Understood, Judge.

21        THE COURT:  All right.  And then I can give you,

22   since I don't think we have anything else scheduled before the

23   trial date, I'll just quickly walk you through sort of

24   logistics of jury selection, trial calendar, that sort of

25   thing.

*Proceedings*                                                    4

1          I know the parties have put in requests to charge.

2    My goal will be to get you my draft of the charge, hopefully

3    the Thursday or Friday, Friday at the latest before the Monday

4    when trial starts, and then we'll do the charge conference one

5    afternoon, late afternoon, after the jury is dismissed.

6          We're still on track for three days, including jury

7    selection?

8          MS. LASH:  Our best estimate, and we're doing this

9    with only guesses at the length of cross-examination, is if

10   jury selection concludes on Monday, we believe the

11   government's evidence would be in Tuesday and Wednesday,

12   possibly running over to Thursday, depending on the

13   cross-examinations, but would not exceed the week of

14   October 7th.

15         THE COURT:  All right.  So we can talk about this

16   more when we talk about jury selection.  Given that we'll need

17   to qualify a relatively large panel before peremptories, kind

18   of viewing this as at a minimum a week long trial just given

19   the vagaries of jury trials, but we can talk about that in a

20   little bit.

21         MS. LASH:  Your Honor, before you continue with the

22   in limine rulings, on the jury selections, the government

23   would object to some of the instructions the defense has

24   proposed.  We're happy to respond in writing, if that would be

25   amenable to the Court, or we could be heard at the charge

1    conference if that's a more efficient manner.  But we did want

2    to ask how the Court would proceed on that.

3            THE COURT:  On which issues?

4            MS. LASH:  On some of the jury instructions that the

5    defense proposed.

6            THE COURT:  You'll see my draft in advance of that

7    and then address it at the charge conference.

8            MS. LASH:  Understood.  Thank you.

9            THE COURT:  All right.

10           MR. STEIN:  Judge, I'm sorry.

11           THE COURT:  You can be seated.

12           MR. STEIN:  I don't know if you have a list of

13   things to go through.

14           THE COURT:  You can stay in your chair.

15           MR. STEIN:  I like to stand up.  So the seating in

16   the courtroom is obviously somewhat limited.  I don't know how

17   many prospective jurors you're going to be bringing in on the

18   seventh, but I'm going to have probably anywhere from half a

19   dozen to eight people from my client's family who may be here.

20           I don't know if they're going to be here during jury

21   selection or just when the testimony starts.  So I don't know

22   if there's like a way to accommodate them in the overflow room

23   or what.

24           THE COURT:  Let's just raise that when we talk

25   logistics later this morning.  But my intention is to fill the

1   gallery completely with the venire panel.  So we'll figure

2   something out.  I think on my notes here I've got all the

3   various in limines, but obviously when we go through all of

4   them, if I've missed one from either side or more than one,

5   please let me know.

6          My intention is to get through all of them.  So if I

7   didn't mention one, it's not because I want to linger on it.

8   So the first one I'm going to discuss, and I don't think I'm

9   doing this in any particular order, but I'm going to bounce

10  around a little bit, is -- and some of these are mirror images

11  of each other.  The first one has to do with Mr. Ragano's

12  guilty plea regarding the extortionate conduct from the

13  Alimena case.

14         I'm going to, with respect to that -- and just let

15  me make sure I understand.  Is it the government's intention

16  to introduce the transcript?  How does the government propose

17  that that evidence would come?

18         MR. REICH:  So, Your Honor, we've contemplated a

19  number of ways and wanted to first understand the contour of

20  what Your Honor's ruling would be today.  We envision that

21  there could be either a stipulation to the guilty plea.  We

22  could admit a certified copy of the judgment in that case, and

23  we've also contemplated whether or not the allocution itself

24  would come in in some way, either through a certified copy or

25  through some other way.

1          THE COURT:  My ruling on the motion is that I'm

2     going to grant the government's motion and deny the

3     defendant's.

4          I think that the plea in Alimena, given the charges

5     in this case, is direct evidence of the charges in the instant

6     indictment, as the charges at least in Counts 1 and 2

7     reference a continuation of the same loan as in Alimena.

8     Certainly this is not being introduced for propensity reasons,

9     and as such, I find that it comes in as for all the

10    permissible reasons under Rule 404 that it goes to intent, it

11    goes to knowledge, it goes to absence of mistake.

12          For that reason, I think that the guilty plea is

13    relevant and admissible.  I'll leave it to the parties to

14    decide how to introduce that, and if you can work out the

15    stipulation to that effect, that's fine.  And obviously, just

16    so that there's no ambiguity, any stipulation that you do work

17    out would be on a non-prejudice basis.  You obviously will

18    maintain your objection.  I certainly would not want there to

19    be any chance or risk that it's viewed that any stipulation

20    you entered into or any agreement logistically that you enter

21    into is in any way a waiver of your right to have this

22    argument on appeal, if necessary.

23          Any questions about that motion, Mr. Stein?

24          MR. STEIN:  Judge, not really.  I mean in all of our

25    filings we have consistently said that we're not disputing the

1   existence of the loan.  It would be foolish, frankly, to do

2   so.  I don't think it's much of an issue at the trial.

3           THE COURT:  But the government is still allowed to

4   show direct evidence of the extortionate scheme, and this is

5   just an extension of that.  So that's the basis for my ruling.

6           MR. STEIN:  I understand, Judge.

7           THE COURT:  The next what I've been considering sort

8   of mirror motions is the issue of whether statements by the

9   individual identified as co-conspirator one are admissible as

10  statements in furtherance of a conspiracy.

11          I find that they are.  So in that respect I'm going

12  to deny the defendant's motion and grant the government's

13  motion having to do with co-conspirator one statements.  I

14  find that the government sufficiently has shown, at this stage

15  at least, by a preponderance the existence of a conspiracy

16  between the individual identified as co-conspirator one and

17  the defendant to collect payments from the individual

18  identified as the victim John Doe by extortionate means, and

19  that the statements of that co-conspirator occurred during the

20  time frame of that conspiracy and were made in furtherance of

21  that conspiracy.

22          I do note that the government further represents

23  that the recorded statements will be corroborated by the

24  government's other independent admissible evidence.  Obviously

25  if during the course of the trial the government fails to

*Proceedings*                                                    9

1  establish by a preponderance the existence of that conspiracy,

2  and that the statements were made in furtherance of that

3  conspiracy, they certainly do that at their peril in terms of

4  what might happen in terms of modification or some other

5  instructions, if that doesn't pan out during the trial.

6          As presented to me now, there is sufficient evidence

7  to find that co-conspirator one is, in fact, a co-conspirator

8  of Mr. Ragano in the conspiracy to collect on the loan.

9          Any questions about that?

10         MR. REICH:  None from the government, Your Honor.

11         THE COURT:  Mr. Stein?

12         MR. STEIN:  No.

13         THE COURT:  I want to turn now to the defense's

14 motion to exclude conversations, what I'll call the outside

15 the courtroom conversations.  Before I issue my ruling, is

16 your application limited to the November 15, 2022 or are you

17 trying to preclude all the conversations that may have

18 occurred in the hallway, for lack of a better term?

19         MR. STEIN:  Our request focused on November 15,

20 2022.  I don't recall off the top of my head how much detail

21 the government gave as to the other occasions as compared to

22 November 15, 2022 encounter.  But our argument would apply to

23 all, or should apply to all, the logic of it does.  I don't

24 see any way to distinguish it.

25         THE COURT:  I'm denying that motion.  I think the

*Proceedings*                                                    10

1   evidence regarding conversations that the defendant and John

2   Doe had at the courthouse on whatever date are relevant and

3   admissible.  These conversations are relevant to proving the

4   charged offenses, namely that during that time period of those

5   pre-court hearings in the Alimena case, that the defendant

6   either attempted to or collected an extension of credit to

7   John Doe by extortionate means.

8            So any statements by the defendant are also party

9   admissions.  So for those reasons I'm going to allow evidence,

10  and presumably it's mainly through the testimony of John Doe.

11  Is that correct?

12           MR. REICH:  That's right, Your Honor.

13           THE COURT:  That there be discussion of those

14  conversations.  Is that correct?

15           MR. REICH:  Your Honor, there may be other witness

16  testimony, but primarily John Doe.

17           THE COURT:  Right.  That's why I said maybe.

18           MR. REICH:  I just wanted to clarify.

19           THE COURT:  Thank you.  I want to turn to the

20  government's motion regarding the defendant's pretrial

21  supervision conditions.  I do have some questions on this and,

22  in particular, I just want to make sure.  I think my

23  understanding is correct, but before I rule on the motion, I

24  want to make sure it is.  I want to make sure I understand the

25  interplay of the pretrial supervisions to Counts 3 and 4.

1    Right?  Because it only pertains to Counts 3 and 4.

2            So I just want to hear from the government an

3    outline of Counts 3 and 4 and how the alleged violation of the

4    pretrial conditions go to Counts 3 and 4.

5            MR. REICH:  Sure, Your Honor.  I think in a number

6    of ways.  Counts 3 and 4 are respectively harassing a witness

7    and witness tampering.  Those relate to communications between

8    the defendant and John Doe with the intent and outcome that

9    John Doe be hindered or prevented from reporting the

10   defendant's conduct in two respects, two relevant authorities.

11           One being the conduct of continuing to attempt to

12   collect the loan using extortionate means, and one being the

13   conduct of violating conditions of pretrial release, including

14   communicating with John Doe outside the presence of attorneys.

15   And I think that that goes, as Your Honor mentioned, that is

16   mainly with respect to Counts 3 and 4.  There's some element

17   of the pretrial conditions that also go to showing the intent

18   and motive in Counts 1 and 2, as well.

19           The defendant's intentional obfuscation of some of

20   these pretrial conditions show his awareness that what he was

21   doing was wrong.  So, for example, avoid using his own phone

22   to contact John Doe because he knew that it was being

23   monitored by pretrial services or using a middleman,

24   co-conspirator one, to reach out to John Doe, rather than

25   doing it himself.

1          So I think the terms of his pretrial conditions are

2    crucial not just to showing that he was acting with a guilty

3    conscious and aware of the illegality of his collections as to

4    Count 1 and 2, but also they go to the very nature of what he

5    was thwarting John Doe from reporting with respect to Counts 3

6    and 4.

7          THE COURT:  Let me go beyond, then, this motion.

8    With respect to the references in Counts 3 and 4 to Counts 1

9    and 2, namely that it is a form of either witness tampering or

10   harassment of a witness, is the government's theory that that

11   would be the case in any collection of extortionate credit?

12   In other words, if you are extorting me for credit, right, so

13   that there is the independent charge of that, as we have here

14   in Counts 1 and 2, would I necessarily always be a witness who

15   can be tampered with, so that in any situation could a victim

16   of any crime also be charged as the subject, for lack of a

17   better term, of a witness tampering or a witness harassment

18   claim?

19         MR. REICH:  Your Honor, I think the answer to that

20   is yes, but there needs to be evidence that the defendant took

21   actions to stop the victim from reporting the crime.

22         THE COURT:  And I assume, then, by that answer that

23   during the course of the government's proof there will be

24   proof of that?

25         MR. REICH:  That's correct, Your Honor, yes.

*Proceedings*                                                           13

1    THE COURT:  For both prongs of each of Counts 3 and

2    4, by that I mean the prong related to the extortionate

3    collection and the prong related to the pretrial supervision?

4         MR. REICH:  That's right.  The government intends to

5    prove both those at trial.

6         THE COURT:  Is it the government's position that if

7    there is a failure of that proof, so that if it's not just I

8    am the victim of a crime and, therefore, by definition a

9    witness to that crime, more likely than not that that in and

10   of itself wouldn't be enough to maintain a witness tampering

11   or witness harassment?

12        MR. REICH:  I think that's correct, Your Honor.

13   Obviously there -- I'm sorry.

14        THE COURT:  There has to be a plus.

15        MR. REICH:  There has to be a plus.

16        THE COURT:  It's not just your status as a victim,

17   which by definition makes you a witness?

18        MR. REICH:  Correct.  It is that plus an effort to

19   prevent the witness from relaying the information and

20   revealing the information.  Of course each of those Counts 3

21   and 4, as you noted, have two prongs.  So it's either proving

22   that as to the extortionate conduct or that as to the

23   violations of pretrial release.

24        THE COURT:  Right.  So that's certainly -- I don't

25   want to get into the jury charge issue now, but the government

1   should be prepared to address whether given that each of

2   Count 3 and 4 has not objects, but I'll use that term loosely,

3   but two different objects, whether the jury instructions need

4   to be specific and maybe they are already, I just haven't

5   gotten into your jury instructions yet, about which of those

6   offenses need to be demonstrated.

7            MS. LASH:  Your Honor, in our -- this is Devon Lash

8   for the United States.  In our jury instructions we simply

9   listed that either, obviously, either prong is sufficient for

10  a finding by the jury.  The verdict sheet does not specify.

11  It's not a special interrogatory that says which has the jury

12  found.

13           We looked into this, as to whether that would be

14  required, and we believe that it is not.  I can provide more

15  information to the Court in a written filing in advance of the

16  Court's jury instructions that will lay out why we believe

17  that these are not objects that would require either special

18  interrogatories or additional information.  As it would in an

19  alternate scenario where if we charged witness intimidation as

20  to John Doe one and say just for argument's sake John Doe two,

21  then it would require the jury to find which John Doe was

22  intimidated by the charge, which is what happened in one of

23  the instructions that we've cited underlying the harassment

24  and tampering charges.

25           The name of the case is escaping me, but I believe

1   it was attachment Exhibit C to our jury instructions.  It was

2   a case in front of Judge Chen that dealt with tampering and

3   harassment.  In that case because the individual who was being

4   tampered with is legally considered an object of the charge,

5   it does require the jury to find an additional finding as to

6   who was being harassed are tampered with.  Here we believe

7   that because these are alternate methods of proof, such

8   specificity isn't required.

9        THE COURT:  So the instruction, again, this is a

10  question that I will want answered, is -- so, for example, you

11  can have the jury, six of them, believe that the pretrial

12  violation condition was, in fact, that that prong was what was

13  proven, and you can have the other six think that it was the

14  John Doe, the extortionate collection prong that was proven,

15  and you don't know need unanimity as to that underlying part

16  of the charge.

17       MS. LASH:  From the review of the case law, that's

18  what I understand is appropriate here.  But we can provide

19  additional law and reasons for that to the Court.  I'm sorry I

20  don't have that.

21       THE COURT:  This wasn't intended as a charge.  Look,

22  obviously those two counts I've been trying to do some level

23  of thinking on.  And so if you can provide some answers in a

24  letter.  Why don't you do that by the 23rd, and, obviously,

25  Mr. Stein if you could get me something, depending on what

1   they say, if you can get me something early in the week of the

2   30th, so before the fourth so that I have time to think about

3   it as I'm drafting the proposed jury charge that I want to

4   give to you by the fourth.

5          MR. STEIN:  Sure, Judge.  We can do that.  I realize

6   this isn't a charge conference, but because of the discussion

7   that's going on we need to point out that we have a problem

8   with the government's request to charge.  I know that they

9   have attached as Exhibit C, I think it's the Hiller case from

10  Judge Chen.  The indictment in this case charges in Counts 3

11  and 4 the two prongs as you've referred to them, the violation

12  of the conditions of release and the extortionate conduct.

13         The indictment alleges it in the conjunctive.  It

14  says "and", and the statute.  The indictment alleges that it's

15  in the "and".  Excuse me.  It's in the conjunctive, and the

16  government is arguing that you should charge in the

17  disjunctive so that they could prove either or.  We disagree

18  with that.  I know you haven't set a schedule yet for any

19  objections to their charges.

20         But if we're correct that they have to be guided by

21  what's charged in the indictment, which is in the conjunctive,

22  then it's a whole different ball game as far as this

23  discussion is concerned.

24         THE COURT:  Why don't you brief that in your papers

25  and you respond, and then we can deal with that in the charge

1   conference.

2           MR. STEIN:  Fine.

3           THE COURT:  In light of this discussion as it

4   relates to Mr. Ragano's pretrial supervision conditions, I'm

5   going to grant the government's motion to admit those pretrial

6   supervision conditions.  Again, I'll leave it to the parties

7   for the defense's sake on a non-prejudiced basis to figure out

8   how you want to introduce those, either by stip or whether

9   it's just maybe the bond condition page.

10          I do find, given the nature of what's charged in

11  Count 3 and Count 4, and also given the fact that I've

12  admitted or just ruled that the plea is coming in, I don't see

13  the fact that he's on pretrial supervision to be any more

14  prejudicial than to the extent the plea might be deemed

15  prejudicial.

16          Given that, I think it's, like I said, directly

17  related to the charges in Counts 3 and 4 and, therefore,

18  relevant.  And in light of the fact that the plea is already

19  coming in, I'm going to admit the pretrial supervision

20  conditions to come in but I'll let the parties figure out, if

21  they can, how they want that to come in.  Obviously if there's

22  disagreement, then you can come back to me on that.

23          Next is the prior convictions of the defendant if he

24  chooses to testify.  I think the -- is the government moving

25  for the Alimena conviction or in light of my ruling on --

1   because my view is, given what I've allowed already with

2   respect to the Alimena plea, if he chooses to testify, the

3   Alimena -- the plea is fair game because it's already come in

4   for the truth of the matter, not for solely impeachment

5   purposes.

6            So as I see it, really what's at play is the 2014

7   conviction and the 2002 fraudulent tax return conviction.

8            MR. REICH:  That's right, Your Honor.  Because the

9   government was moving to admit evidence of the Alimena

10  conviction in its case in chief, we did that separately.  And

11  in this motion that Your Honor is addressing now, we're

12  referring only to cases that we would bring in should the

13  defendant testify.

14           THE COURT:  And there aren't others?  Those are the

15  only ones?

16           MR. REICH:  Those are the only two the government is

17  moving on, Your Honor.

18           THE COURT:  With respect to the 2014 conviction, I'm

19  going allow that and I'll go through my reasoning in a minute.

20  I'm not going to allow the 2002 conviction, and I'll go

21  through my reasoning in a second.

22           With respect to the 2014 conviction, Mr. Ragano pled

23  guilty to extending a loan with a usurious rate.  He received

24  a sentence of 51 months imprisonment and three years of

25  supervised release.

1            I find that that conviction does satisfy the

2    requirements of Rule 609, certainly within the time period.

3    So the proximity of the crime to this one weighs in favor of

4    admission.  While the debt collection, the fact that it was a

5    debt collection conviction given the similarities to this case

6    would normally weigh against admission, I think that a proper

7    limiting instruction, to the extent the defense wants to offer

8    one, can deal with that issue.

9            And, certainly, the conviction goes to his

10   credibility under Rule 609, and the government should be

11   permitted to probe that as part of impeaching him.

12           The 2002 conviction, I just find that that's too

13   distant in time.  While certainly the nature of that

14   conviction, fraudulent tax returns, does go to credibility, I

15   think that on balance, the prejudicial affect given its age

16   outweighs the probative value and swings in favor of excluding

17   that conviction.

18           Any questions about that?

19           MR. REICH:  No, Your Honor.

20           THE COURT:  Mr. Stein?

21           MR. STEIN:  No, Judge.

22           THE COURT:  The other 609 related motion has to do

23   with Mr. Ragano's motion to preclude any cross-examination of

24   a 2006 conviction for the individual who is the -- is he the

25   owner or shopkeeper?

*Proceedings*                                                          20

1        MR. STEIN:  He's the owner, Your Honor.

2        THE COURT:  My understanding is that the sole reason

3   for his testimony and the only thing he's going to be

4   testifying about is the photos that he took, and sort of

5   laying the foundation for the admission of those photos.  Or

6   is there more?

7        MR. STEIN:  He was not a witness to what happened on

8   July 5th.  I don't believe he was there.  He'll identify the

9   photographs and he'll testify about his understanding of the

10  system, the video surveillance system.

11       THE COURT:  In his own business?

12       MR. STEIN:  Correct.

13       THE COURT:  And my understanding from the

14  government's response is that to the extent that that's the

15  nature and extent of that individual's testimony, that the

16  government would not seek to try to impeach him with the prior

17  conviction; is that correct?

18       MR. REICH:  That's correct, Your Honor.

19       THE COURT:  So assuming those parameters hold, then

20  I don't see a reason to make a ruling.  Obviously if something

21  changes and this witness is going to be dealing with or

22  providing testimony that is of a more substantive nature than

23  strictly sort of a custodian type witness, then I will revisit

24  this ruling because I do think that the conviction for

25  falsification of business records, even though it is outside

*Proceedings*                                                        21

1   the ten-year window, is something that might be relevant to

2   the credibility of the witness.  But, again, that will be on

3   balance, depending on the nature and extent of his testimony.

4           For now, based on the parties' representations,

5   there is no basis to allow examination on that issue, and the

6   government has indicated that it doesn't intend to do so.

7           The next item is the government's motion to admit

8   Mr. Ragano's participation in the marijuana scheme.  I want to

9   make sure I understand the setup for this, and if you can tell

10  me how the marijuana scheme relates to the nature and extent

11  of the relationship between the defendant and John Doe.

12          MR. REICH:  Sure, Your Honor.  So I would say that

13  in the first instance it describes the nature of their

14  relationship with one another, in that sometime after they met

15  they began engaging in this, what could be described as a

16  business venture, illegal business venture together more

17  importantly.

18          It shows the nature of their relationship such that

19  there came a time that -- excuse me.  I would say that it

20  lends context to the nature of the ongoing communications

21  between them, the attempts to collect the loan, the

22  acquisition of the loan in the first instance.  It describes

23  how they came to know and have a position of trust with one

24  another.

25          It describes how not only the defendant and the

1  victim, John Doe, came to know one another, but also how the

2  defendant and the individual we describe as individual one

3  came to know each other and worked together and begin to

4  establish a position of trust with one another, such that

5  admissions were made by the defendant to individual one that

6  are important in this case, and that the government is going

7  to emphasize in this case as evidence of the defendant's

8  intent when it comes to the extortionate collection scheme.

9          THE COURT:  Was this based on your evidence?  Was

10  this the first -- were these the first interactions that John

11  Doe had with the defendant?

12          MR. REICH:  These were not the first interactions

13  with the defendant, no, Your Honor.

14          THE COURT:  What about prior, for lack of a better

15  term, business dealings?

16          MR. REICH:  Your Honor, the marijuana scheme does

17  not pre-date the granting of the loan in the first instance.

18  And so it is not the government's argument that it necessarily

19  goes to the circumstances around the loan itself, but much

20  more to the circumstances around the attempts at extortionate

21  collection.

22          Parts of that story explain why John Doe would have

23  fear of these threats and would perceive statements made by

24  the defendant as threats, and why statements and actions taken

25  and made by the defendant could be perceived as threats given

*Proceedings*                                                      23

1    the way he was known to conduct his business and given the way

2    these individuals knew him to conduct his business and, you

3    know, understood his reputation and understood how he viewed

4    himself.

5         THE COURT:  But regardless of whether the schemes

6    are separate, at least my understanding from the papers is

7    that they were occurring at the same time; is that correct?

8         MR. REICH:  Yes, Your Honor, they were.  Yes.  What

9    I would want to emphasize would be not only the way that the

10   marijuana scheme lends context to the way John Doe perceived

11   things and understood the defendant and perceived the

12   defendant, but also the way individual one understood the

13   defendant and perceived the defendant.  And as we reference in

14   the motion, it also provides the necessary background and

15   context for the government's motion on reputation evidence.

16        It helps establish that these individuals were all

17   in the community together, working together, and observing one

18   another's behavior.

19        THE COURT:  One second.

20        MR. STEIN:  Judge, could I have a moment?

21        THE COURT:  Yes.

22        MR. STEIN:  Judge, I think in discussing this it's

23   somewhat, unless you plan on dealing with it separately,

24   because the four recordings that we objected to for various

25   reasons are sort of intertwined with the government's

1   intention to introduce evidence about the marijuana.

2          So I don't know whether you plan on dealing with the

3   four recordings that we've objected to, but I note that the

4   government, for lack of a better way to phrase it, lumped the

5   four recordings with their intention to introduce the

6   marijuana.

7          MR. REICH:  I think, Your Honor, the marijuana

8   evidence does come in in a couple different ways, one through

9   witness testimony and one is through the recordings that Mr.

10  Stein is referring to.  I can speak to those recordings, as

11  well.

12         THE COURT:  I thought the issue with the

13  recordings -- you don't have a separate motion on the

14  recordings.  You're using that as a basis, or am I misreading

15  your papers?

16         MR. STEIN:  They're sort of intertwined.  We

17  objected to the recordings for two reasons, and you've already

18  dealt with one of them, which is that they're bringing them

19  up, for lack of a better way to phrase it, was untimely.  We

20  objected to that and you ruled on that.

21         But the second objection, a more substantive

22  objection, had to do with their relevance.  Again, I'm just

23  bringing this up because the way the government presented this

24  is that it's intertwined with the marijuana.  We object to the

25  recordings, irrespective of the marijuana conspiracy because

*Proceedings*                                                      25

1  of the nature of the recordings, which were discussed in some

2  detail in our filing.

3        THE COURT:  What is the nature of the recordings?

4  You're challenging --

5        MR. STEIN:  Judge, on our filing, which is ECF No.

6  40, starting at page 4 and going on through page 6, there are

7  a number of recordings, April 19th and 27th of 2021, June 1st

8  of 2021, June 2nd of 2021, and June 2nd of 2021, all of which

9  pre-date the charges in the indictment.

10        But the objection, again, it's because they've

11  combined this with the marijuana.  Our objection to the

12  recordings is a substantive objection because they are

13  irrelevant to what is charged in this case.

14        THE COURT:  Right.  But the recordings speak to, in

15  part, the marijuana.  Correct?

16        MR. REICH:  That's right, Your Honor.

17        THE COURT:  So depending on how I rule on the --

18  you're objecting to the marijuana and the evidence that's

19  going to come in about the marijuana, if I admit it.

20        MR. STEIN:  Judge, it seems to me there are two

21  issues.  You may or may not allow some evidence of the

22  marijuana conspiracy.  As a subset, or a separate issue of

23  that, is whether or not as part of the government's proof of

24  the marijuana is whether you're going to allow these four

25  recordings, because the way we interpret them, they're not

1  related to the marijuana conspiracy.

2          They seem to be more of an explanation of the

3  relationship between Mr. Ragano and individual number one, as

4  I understand it.  I think it's important to understand what

5  the substance of the recordings are, which the government, I

6  think, discussed in their submission and we discussed in our

7  submission.  So I could foresee you letting in the marijuana,

8  even though we've objected to it, but I could also see as a

9  separate ruling that you don't allow the four recordings.

10          THE COURT:  I think the recordings, to the extent

11  they go beyond -- and the government will correct me -- but to

12  the extent they go beyond the marijuana, they also speak to

13  and provide evidence that's relevant to the threat component

14  of the charges in Counts 1 and 2.

15          MR. STEIN:  Judge, that is exactly our point.  For

16  example, on page 5 of our filing, April 19th and April 27th

17  recordings, having to do with a frankly somewhat volatile, if

18  not violent, relationship between Mr. Ragano and a former

19  girlfriend, which the government seems to bring up every time

20  they have an opportunity to, whether it's bail, sentencing, or

21  otherwise.  That has nothing to do with the marijuana.

22          THE COURT:  But it does have to do with his violent

23  tendencies.  And doesn't violent tendency go to the 849

24  charge?  It's part of the threat assessment.

25          MR. STEIN:  Okay.  Judge, we can debate whether or

*Proceedings*                                                              27

1   not we or the government or Your Honor has some perception of

2   whether Mr. Ragano is a violent individual.  But what happened

3   between him and his girlfriend, about which the government

4   makes no representation whatsoever that John Doe knew anything

5   about this, is simply irrelevant.

6            You don't even have to get to a question of whether

7   it's prejudicial.  It's irrelevant.  What does slashing his

8   girlfriend's tires after she slashed his tires, what does that

9   have to do with anything in this case?  I don't see it, Judge.

10           The next recording is June 1, 2021.  Again, there's

11  a question of whether or not John Doe knew anything about

12  this.  The government should not be permitted to just come in

13  here and throw all this stuff at the wall, which demonstrates,

14  in their view, that Mr. Ragano is a violent person.  It has to

15  have some relationship to the charges, and if John Doe knew

16  nothing about this, how is that possibly probative to what

17  happened in this case.

18           Again, the charges, extortionate collection of

19  credit.  What he did with his girlfriend or these other four

20  recordings are irrelevant to this case.

21           THE COURT:  I don't disagree with you, Mr. Stein.

22  The threat component has to be -- there has to be a nexus

23  between the threat and the victim.  Right?  So what was the

24  response?

25           MR. REICH:  Absolutely, Your Honor.  We think these

1   are relevant for a couple of different reasons.  Let me first

2   speak to what you just noted.

3           The government intends to demonstrate that these

4   conversations, these recordings, all of which were between the

5   defendant and individual one, created the impression in

6   individual one's mind that the defendant was someone who was

7   willing to use violence in business and other situations when

8   things didn't go his way, and was not only willing not even

9   specifically that he has used violence, but that he, A) is

10  willing to and B) is trying to convey to others, wants others

11  to know that he's willing to.  That's the nexus of the

12  elements at issue in the extortionate collection charges here.

13          THE COURT:  Why is that not too attenuated from John

14  Doe?

15          MR. REICH:  Of course, Your Honor.  What the

16  government will demonstrate is that through these

17  conversations that happened time and time again, the defendant

18  gave this impression to individual one.  Individual one was

19  then sent to be the collector, he was the go-between between

20  the defendant and John Doe for the first portion of the

21  scheme.

22          So individual one, the government will demonstrate

23  at trial, understood the defendant's reputation, understood

24  the defendant's willingness and constant willingness to

25  reference violence and to threaten violence.  And when he

1    collected payments from John Doe, he relayed that to John Doe.

2    So John Doe was very well aware of all these things directly

3    through individual one.

4         And so I think, Your Honor, that these recordings

5    are helpful and relevant, both in that the message did

6    absolutely get to John Doe, but also just in showing the state

7    of mind and absence of mistake in the defendant when he claims

8    that he may have tried to make attempts to collect but they

9    were not, you know, there was no violence or no threat was

10   intended.  We imagine that the defendant will make that

11   argument at trial.

12        This is directly in contradiction of that, that

13   certainly he is someone who intends to reference his own

14   violent reputation and promotes his own violent reputation,

15   and it goes to his state of mind when he then goes on and

16   makes collections and actually executes business deals in the

17   way that he's describing that he does.

18        THE COURT:  I assume, Mr. Stein, I have to take the

19   government at its word in terms of what the evidence will

20   show, but if there is a nexus -- I'm not saying it has to be a

21   verbatim recounting by John Doe, I mean by individual one to

22   John Doe, but if part of the conversations that individual one

23   effectively as the agent of the defendant has with John Doe,

24   speak to the violent tendencies of the defendant, in part from

25   information that the defendant has conveyed to individual one,

*Proceedings*                                                      30

1   I do believe that's relevant to the 849 charge.

2           MR. STEIN:  Well, I understand what you're saying.

3   You have to accept what the government is representing.  I can

4   tell you, since I tried to study what the government was

5   representing when they filed their request, is I don't believe

6   there was any reference in their filing.  If I'm mistaken, I'm

7   sure they'll correct me.  I don't believe there was any

8   reference in their filing to individual one having

9   communicated this to John Doe.

10          If I've overlooked that, then I'm stuck with that,

11  but I don't recall anything in their filing about it.  Indeed

12  as to all these recordings we said, what does this have to do

13  with John Doe.

14          THE COURT:  So until the trial I'm not going to

15  know.  But I guess my guidance to the government is that I

16  want to make sure that there is a nexus and that that nexus is

17  not too attenuated.  So I'm going to allow the marijuana

18  scheme.  I do find that the evidence proffered regarding the

19  marijuana scheme is intertwined with the evidence regarding

20  the charged offense.  It occurred during the same time period

21  as the original extortionate collection of credit of John Doe.

22  It also involved John Doe and individual one, an individual

23  who the government has represented will testify about the

24  scheme and testify about the defendant's recorded statements.

25          I am finding, based on these representations, that

*Proceedings*                                                            31

1   the testimony and the defendant's statements to individual one

2   provide context to the interactions among the defendant and

3   others, and that all these things are relevant to the threat

4   element of Counts 1 and 2.

5           But like I just started to say, there has to be a

6   nexus.  It just can't be any and everything having to do with

7   violence on the part of defendant automatically goes to the

8   849 threat prong.

9           So this is just a caution that I'm allowing a fair

10  amount of evidence in here to go to that threat component, but

11  that to the extent the government can revisit this, and you

12  can discuss this with the defense, if something even as

13  remotely attenuated and it comes out during the trial and Mr.

14  Stein makes an objection or seeks some sort of curative

15  instruction in that regard, I will be very open to do that.

16          MR. STEIN:  Excuse me, Judge.

17          MS. LASH:  Your Honor, one more point on this issue.

18          MR. STEIN:  Just hold on for one minute.  Judge,

19  you're going to allow this in.  I understand what your ruling

20  is subject to the government producing a nexus that is

21  sufficient for you.  And then, if it turns out the nexus is

22  not sufficiently established, you're going to give a curative

23  instruction.

24          Frankly, Judge, with all due respect, when I hear

25  judges telling me they're going to give a curative

1   instruction, all I can think of is you can't unring the bell.

2   This isn't just some minor thing.  They want to make him out

3   to be the most violent person they possibly can.

4          THE COURT:  Let me interrupt.  What are the specific

5   calls, recordings or items that you believe have no nexus to

6   John Doe, the victim?

7          MR. STEIN:  The four recordings that are referred to

8   in our filing.

9          THE COURT:  You think all four have no nexus?

10         MR. STEIN:  Judge, here is the problem.  As I said,

11  I think correctly, that in their filing they did not represent

12  anything which connected these recordings to John Doe.  Now

13  the government is saying by way of I guess an offer of proof

14  that they do have that evidence.  Well, we don't know anything

15  about that.  We don't have the 3500 material.

16         It's not going to be produced until I believe

17  September 30th, and we're arguing in a vacuum really to what

18  they're representing to the Court.

19         THE COURT:  Let me interrupt you.  Even by your own

20  descriptions in document 40, right, so the April 19th and 27th

21  recordings, right, has to do with the dispute with the

22  girlfriend and the slashed tires.

23         MR. STEIN:  Correct.

24         THE COURT:  I hear you on that one.  My expectation

25  is that based on what I've said to the government that before

1  that recording comes in, there has to be some nexus

2  established that somehow, and I'm making it up, but individual

3  one will testify that yeah, when I told John Doe who he was

4  dealing with, I told him boy, this is a scary guy, and just

5  the other day he told me he slashed his girlfriend's tires.

6          MR. STEIN:  After she slashed his tires.

7          THE COURT:  Whatever.  I mean, if someone commits an

8  offense against me it doesn't give me a right to go commit an

9  offense against them.  Whether there is a basis in the law of

10 the jungle that you can do that, all I'm saying is I was

11 laying out the hypothetical for what I would view as a

12 sufficient nexus.

13         MR. STEIN:  Here's the problem, which I don't mean

14 to be repetitive, Judge.  We pointed out in our arguments as

15 to these four recordings that there wasn't a connection to

16 John Doe, and the government is now representing that there

17 is.

18         So we're having a discussion here in which, frankly,

19 we are at a disadvantage because we knew nothing about some

20 nexus to John Doe.  The government is making the

21 representation, I heard it, and I also did not hear the

22 government correcting me that there was no representation

23 about a nexus to John Doe in their filings.

24         MR. REICH:  Your Honor, I would like to correct --

25         THE COURT:  No, no, no.  Of the four conversations

1  that you outline in document 40, in your response to the

2  motion, only the April 19th and 27th one has to do with the

3  tire slashing.  Everything else has to do with the marijuana.

4  So the marijuana I've already given my reasons about why the

5  marijuana conspiracy is relevant to the charges in this

6  indictment.

7          MR. STEIN:  Judge, I don't agree with you to some

8  extent because the June 2, 2021 conversation, on page 6 of our

9  filing, had to do with an incident that we don't know when it

10  happened because it's not documented in any way.  There was no

11  arrest.

12          Mr. Ragano, for lack of a better way to describe it,

13  bragged about hitting someone over the head with a beer

14  bottle.  It had nothing to do with the marijuana scheme.  We

15  don't know when it happened or if any relationship --

16          THE COURT:  Here's what I'm telling you and here's

17  what I'm telling the government.  If the discussion has to do

18  with the marijuana scheme, I've already said that that's

19  relevant and it's coming in.  If the discussion has to do with

20  some purported act of violence on the part of the defendant,

21  whether that be the tire slashing or hitting someone over the

22  head with a beer bottle, before those recordings can come in

23  through testimony, the government will need to establish that

24  there is a nexus of those statements to some either -- I don't

25  want to pre-judge but there has to be a nexus that is not

1    attenuated, that somehow flows from individual one to John Doe

2    as indicative of the defendant, Mr. Ragano's willingness to

3    commit acts of violence as a threat components of the 849

4    charge.

5            MR. STEIN:  Judge, then I would ask that you require

6    the government to make an offer of proof outside the presence

7    of the jury so we don't have this unringing of the bell

8    problem.

9            THE COURT:  That's what I just said.  I said before

10   they offer the recordings, they will have had to have made

11   that showing through the witness stand.

12           MR. STEIN:  I'm sorry.  I didn't understand it.

13   That would be outside the presence of the jury?

14           THE COURT:  No.  The way I see this happening, in

15   order for those two topics that I just addressed to be

16   admitted as independent evidence, the tapes, would be, for

17   example, individual one saying -- and again, I'm making it up,

18   I don't know what individual one will say -- but something

19   consistent with individual one saying I was dealing with John

20   Doe about this debt that he had to Ragano.

21           I was nervous, I was whatever, I told him Ragano is

22   a serious guy, you know, you better pay up, he's been known to

23   do crazy stuff like slash the tires, hit some guy, there has

24   to be a nexus to the act of violence.

25           Otherwise, then at that point if the government then

1   moves, they will have established, and I'll know what they're

2   doing, if they haven't established you'll make your objection

3   and say Your Honor, they're about to introduce the April 19th

4   and 27th tapes that go to the tire slashing.  I didn't hear

5   anything about that being conveyed in some fashion to Ragano.

6           Is that a clear articulation of how I would want the

7   nexus to be made?

8           MR. REICH:  Absolutely, Your Honor.  Yes.

9           THE COURT:  Does that comport with --

10          MR. STEIN:  Understood, Judge.

11          THE COURT:  But is that consistent with your doing

12  that before the bell is rung?

13          MR. STEIN:  Yes.

14          THE COURT:  All right.

15          MR. REICH:  Your Honor, I just want to relay on the

16  record, if defendant -- if Mr. Stein is looking for where the

17  government first made the argument making the nexus to John

18  Doe, I don't want him to feel surprised.  He can look in our

19  brief at pages 31 to 32, and that explains exactly what I was

20  relaying to Your Honor of the chain of communication from

21  these statements to individual one to John Doe.

22          THE COURT:  All right.  Mr. Stein, I am putting the

23  burden on your shoulders, not the burden of proof, just the

24  burden if government is moving to move that piece of exhibit

25  in and you still have that same objection that you've

1   articulated because you don't believe that they've laid the

2   proper foundation by way of a nexus or it's too attenuated,

3   it's incumbent on you to make that objection.

4           MR. STEIN:  Understood.

5           THE COURT:  The next motion has to do with the

6   defendant's affiliation with organized crime.  I think that

7   that's relevant under the circumstances of the charged

8   offenses, the 849 offenses.  Again, I think that's intertwined

9   with the evidence regarding those charges.

10          In terms of the factual background, at least as has

11  been represented, is that the defendant allegedly learned of

12  the opportunity, the loan sharking opportunity, through

13  members of the Colombo crime family.  He's purportedly a

14  member of the Bonanno crime family, but nevertheless, his

15  affiliation with organized crime provides the background

16  information for the charged offense.

17          Section 849 includes as an element that the

18  defendant knowing and intentionally participated in the use of

19  extortionate means, which obviously have been defined to

20  include purported acts of violence, and that, therefore, his

21  reputation of involvement with organized crime provides a

22  proper foundation to show that the defendant was aware of his

23  own reputation and that he expected it would induce fear in

24  the ordinary person, in this case the alleged victim, John

25  Doe.

*Proceedings*                                                    38

1          So for those reasons, I'm going to allow reference

2   to his membership in organized crime.  Again, I caution the

3   government that this is not a RICO case.  So that reference

4   should not take up too much time and should not become a mini

5   trial in terms of proving that the defendant is, in fact, a

6   member of the Bonanno family.

7          But some reference to that, I believe, is

8   appropriate given the nature of the charges.  I am going to

9   preclude, though, reference to the defendant's nickname of

10  Maniac.  I find that that is more prejudicial than probative,

11  especially here where I'm permitting reference to his

12  affiliation with organized crime.

13         That, then, sort of segue ways into the motion of

14  the victim reference for John Doe.  I'm not going to limit the

15  use of victim as a rhetorical device during arguments.  But

16  I'm going to -- there's no need to describe John Doe as the

17  victim during your questions, you, being the government.  For

18  example, if the agent is on the stand and, again, I'm making

19  up a question, you know, that says when you spoke to so and

20  so, meaning John Doe, I would want him referred to as Mr. Doe,

21  or whatever his name is, not when you spoke to the victim.

22         So I'm allowing the government to use victim as a

23  rhetorical device in its arguments, so the opening summation

24  and its rebuttal.  But during the course of the trial when

25  we're talking about the facts of the case, that individual

1   will be referred to by his name or a nickname, whatever anyone

2   knew him as, but not as the victim.

3          Any questions on that ruling?

4          MR. REICH:  No, Your Honor.

5          THE COURT:  The government had made a motion, which

6   I think is mooted out by the defense response on this issue of

7   selective prosecution, which I don't think is what the defense

8   was arguing.  But given the defense's response that it's not

9   contending that there was a selective prosecution in this

10  case, I don't see that motion as one that needs to be ruled

11  on.

12         I will say, just going to, I guess, it's something

13  that will come up in the charge, but I'm not intending, to the

14  extent that it's relevant for this purpose, I'm not intending

15  to charge the jury that they can draw a negative inference

16  from the fact that the government didn't have surveillance

17  footage from the courtroom hallway or from the auto parts

18  shop.

19         I'm going to give my standard instruction on the

20  particular investigative technique not required, which is a

21  pretty standard charge, but I'm not going to be saying

22  anything more about investigative techniques.

23         MR. STEIN:  Judge, I would ask that incorporated

24  into your instruction about investigative techniques, that you

25  remind the jury that the burden of proof is upon the

*Proceedings*                                                              40

1  government beyond a reasonable doubt, which can be based on

2  the evidence or lack of evidence.

3          THE COURT:  That's part of the standard charge.

4          MR. STEIN:  I'm asking that it be specifically

5  incorporated in the instruction that you give on investigative

6  techniques.

7          THE COURT:  I'll read it to you right now what I'm

8  going to say.  There is no legal requirement that

9  law enforcement agents investigate crimes in a particular way,

10  or that the government prove its case through any particular

11  means.

12          While you're carefully to consider the

13  law enforcement evidence introduced by the government, you are

14  not to speculate as to why they used the techniques they did

15  or why they did not use other techniques.  The government is

16  not on trial.  Law enforcement techniques are not your

17  concern.  Your concern is to determine whether on the evidence

18  or lack of evidence the government has proven its case beyond

19  a reasonable doubt.  So I think that motion is moot, unless

20  someone thinks it isn't.

21          MR. REICH:  To expand a little bit, Your Honor, on

22  the government's concern.  I think counsel has made it clear

23  throughout proceedings that they may intend to introduce an

24  argument that somehow John Doe and the FBI conspired or were

25  in cahoots to create a case against the defendant where none

1   existed.

2           That's, I think, one of the things that the

3   government really wants to get to here.  It's been sort of

4   alluded to in the defendant's motions.  Certainly we think

5   it's one thing to, for example, as to the July 5th incident,

6   it's one thing to allude to the defendant, the reasons why the

7   defendant may have made statements that he made, he was riled

8   up, X,Y,Z, it's another thing to say the FBI and John Doe

9   colluded to set him up or entrap him in some way, which as

10  Your Honor knows, is a very different area that we don't

11  believe we've weighed into.  We want to raise that idea

12  specifically.

13          THE COURT:  Well, certainly, it's a little too late

14  in the day to raise an entrapment defense.

15          MR. STEIN:  We never used that word anyway.

16          MR. REICH:  The point here though is not to sort of

17  back door an entrapment defense without proving the elements

18  of one.

19          MR. STEIN:  Judge, this is very important.  They

20  started the investigation in this case in November of 2022.

21  Up until July 5th there were various recordings that were made

22  between, it's hard to remember all the descriptions,

23  co-conspirator number one and John Doe, which we've contended

24  were not attempts to collection by extortionate means until we

25  got to July 5th.

1          So they're spending, I assume, a fair amount of

2    resources starting from November of 2022 up until July 5,

3    2023.  In our opinion, they came up with very little, if

4    anything, that constitutes an extortionate attempt to collect

5    the loan.

6          So on July 5, 2023, John Doe is recording

7    conversations.  I'm pretty sure he wasn't out there

8    freelancing on his own, and before he met Mr. Ragano at his

9    place of business, there was a meeting.  Of course I wasn't

10   privy to it.  Mr. Ragano wasn't privy to it.  There was a

11   meeting between John Doe and the agents.  Indeed, after the

12   encounter at Mr. Ragano's business, there's a brief recording

13   with John Doe speaking to the agents.  So they were obviously

14   monitoring what was going on.  They're not going to send

15   somebody out who's cooperating to just freelance on his own.

16         I think it's a fair argument to say that after many

17   months of coming up with very little, if any, evidence of an

18   extortionate attempt to collect a loan, that there was some

19   plan when John Doe went to Mr. Ragano's office.  And I think

20   it's fair comment on us that that's what happened.

21         THE COURT:  Can you ask John Doe on cross, you know,

22   before the July 5th meeting did you have any discussions with

23   the government, including the prosecutor's office and the FBI?

24   Of course you can ask that.  What did they tell you?  You can

25   ask that.

1          Are you free to make an argument that up until

2    July 5th there was no evidence but -- I don't know --

3    hopefully your argument is not going to be, but then on

4    July 5th there is evidence but it was premeditated or

5    prefabricated by the government and you should discount it.

6    That would be an admission.

7          MR. STEIN:  I didn't say there was no evidence, I

8    said very little, if any, evidence.  It's not surprising that

9    five days after this incident at Mr. Ragano's office on

10   July 5th, Mr. Ragano was surrendering to begin his 57-month

11   sentence.  I don't think it's a coincidence that after many

12   months of what we believe was basically absence of any

13   convincing evidence of an extortionate attempt to collect the

14   loan, that on this occasion John Doe goes to his office.

15         THE COURT:  I don't think anyone is saying that John

16   Doe -- I can't imagine John Doe -- I agree with you.  I don't

17   know, but I can't imagine John Doe went there on his own.

18   Listening to the recording, as I did, it's clear that the

19   agent was monitoring what was happening.

20         MR. STEIN:  As I understand what the government is

21   arguing now, they want to be able to preclude us from arguing

22   that what happened on July 5th was part of a plan that was

23   conceived of, plan obviously is my word, that was preconceived

24   by John Doe who was being monitored by the agents.  That's

25   fair comment.  If they want to deny that or they have their

*Proceedings*                                                        44

1    argument and their rebuttal summation, fine.

2           THE COURT:  Hold on for a second.  Is your question

3    whether the idea to go visit Ragano on July 5th, that John Doe

4    went to the case agent and said hey, I think it would be a

5    good idea for me to go?

6           MR. STEIN:  That's not what happened, Judge.

7    There's a recording.

8           THE COURT:  I've listened to that recording.

9           MR. STEIN:  There's a recording that pre-dated

10   July 5th.

11          THE COURT:  Yes, about just show up and do I need to

12   not make an appointment but is there a specific day; no, just

13   show up, he works these days.  I listened to all the

14   recordings.

15          MR. STEIN:  Correct.

16          THE COURT:  It's fair game for you to say, look,

17   ladies and gentlemen, Mr. Ragano was set to surrender -- what

18   day was he set to surrender?

19          MR. STEIN:  July 10th.

20          THE COURT:  On July 10th, and the government was so

21   desperate because they had no evidence that they wanted to

22   send this guy in one more time to see if he would say

23   something incriminating.  That's fair argument.  You're

24   allowed.  If the government tells me that I shouldn't let that

25   in, I'll hear it.  But I'm going to let you argue that.

*Proceedings*                                                           45

1          MR. STEIN:  Maybe we're not -- this is unnecessary

2    but I thought the argument was being made that we shouldn't be

3    able to argue that this is what happened between John Doe and

4    the agents.

5          THE COURT:  There doesn't seem to be a dispute that,

6    and maybe the government will correct me, but there doesn't

7    seem to be a dispute that July 5th was a coordinated

8    investigative technique to send in John Doe to elicit, if

9    possible, incriminating statements from your client.  I expect

10   the government to do that in an investigation.

11         And you can -- if your argument is that somehow

12   that's improper, that I won't allow because there's nothing

13   improper about that.  If your argument is that the reason they

14   needed to do that is because the evidence they spent a year

15   investigating this guy and they were desperate because in five

16   more days and he was going to prison and they wanted to try to

17   get something, that's fair argument.  You can make that

18   argument.  Is the government seeing it differently than I'm

19   seeing it?

20         MR. REICH:  I think that's right, Your Honor.  But

21   to expand on it, I think another improper argument here would

22   be to say that the FBI and John Doe induced Mr. Ragano to

23   commit a crime.  That, again, is entrapment.

24         THE COURT:  I don't hear that from Mr. Stein, but if

25   I did I would not allow that.

*Proceedings*                                                        46

 1          MR. STEIN:  Judge, you have to remember what

 2   happened here on July 5th.  John Doe goes in there --

 3          THE COURT:  It's literally like 48 seconds or

 4   something, or three minutes, whatever.  I can't even imagine

 5   there's enough time for the guys to take his clothes off,

 6   which is one of things.  I have that tape in my head.  It

 7   takes no time.

 8          He goes in, there's the screaming, he accuses him,

 9   the ruse that you'll say is that John Doe accuses Ragano of

10   being the cooperator and that that was done in an attempt to

11   rile him up.

12          MR. STEIN:  Correct.

13          THE COURT:  Fine.  That's what happened.  You're

14   allowed to say, when you went in there you knew what you were

15   going to say, however you want to cross him.  But if any

16   portion of the argument is that somehow there was no -- that

17   the loan was something that the FBI in cahoots with John Doe

18   said hey, why don't you go in there and offer to borrow money

19   from this guy so that he can then threaten to knock your head

20   off, there's zero evidence of that and I'm not going to allow

21   any argument along those lines.

22          Anything else on this motion?

23          MR. REICH:  No, Your Honor.  Thank you.

24          THE COURT:  In keeping with the July 5th, 2023

25   conversation --

*Proceedings*                                                    47

1          MR. STEIN:  Judge, I'm sorry to interrupt.  I just

2     want to make sure because obviously this is a very important

3     occasion.  It's not just the conversation, but the presence of

4     the two employees.  I just want --

5          THE COURT:  That's where I'm going now.

6          MR. STEIN:  I want to make sure because it was in a

7     footnote.  I'm sure Your Honor is very careful.  But

8     respectfully, you had misspoke in a previous order in which

9     you had written that during the course of this incident the

10    two employees were behind John Doe, which was frankly from the

11    government's representation of what happened incorrect,

12    because they represented that the two individuals were behind

13    Mr. Ragano, which is of some significance since we're arguing

14    that this is irrelevant and he didn't know anything about them

15    because they were behind him, as well as the fact that nothing

16    was said.

17         THE COURT:  If I misrepresented or misnoted where

18    they were standing, I think there's no question from listening

19    to the tape that John Doe was aware of the presence of these

20    individuals, whether they were behind him at some point or in

21    front of him, I don't know.  And if I got that wrong in the

22    record, apologies.  But there's clearly no doubt from the

23    recording that he was aware of the presence of the two

24    individuals.

25         MR. STEIN:  Judge, maybe your recollection is better

*Proceedings*                                                      48

1   and maybe theirs is better than mine, but I don't think

2   there's anything in the tape from which one could conclude

3   that Mr. Ragano was aware --

4          THE COURT:  Oh, that Mr. Ragano was aware.  Oh,

5   that's not what I was saying.  I was saying that from my

6   perspective the important thing from a perceived threat is

7   that the victim is aware of it.

8          MR. STEIN:  Correct, Judge.  That's a different

9   point.  The argument that we're making as to why the presence

10  of the two other employees is irrelevant is, for among other

11  reasons, Mr. Ragano did not know anything about them because

12  there's no recording, there's no statement that Mr. Ragano

13  himself knew about those two individuals, and that's why I

14  brought up the point that the government represented that the

15  two individuals were behind Mr. Ragano so he wouldn't have

16  seen them.

17         THE COURT:  I see that.  Look, that's fair argument

18  but I think the point of why this is relevant is that when

19  you -- it's whether something is reasonably -- you can

20  reasonably infer, right?

21         Before July 5th you have indication from, I'm losing

22  my monikers, I guess it's co-conspirator one.

23         MR. REICH:  Yes, Your Honor.

24         THE COURT:  Co-conspirator one dealing with John

25  Doe.  Co-conspirator one saying, effectively, Ragano wants you

*Proceedings*                                                    49

1    to show up at his place of business.  Don't worry, just show

2    up, he works these hours.  He then shows up.  There's the

3    screaming match.  You can argue who instigated the screaming

4    match, and then the two fellows, one with the tire iron, one

5    with the crowbar shows up.

6           Obviously I know you have no burden, but in terms of

7    examining John Doe or the agent, you have every right to argue

8    that Ragano has no knowledge of this and the government has

9    every right to argue that the reason that Ragano wanted John

10   Doe to show up there is because he knew he had support there.

11          MR. STEIN:  Judge, the point of what I'm trying to

12   argue is that I understand we can argue all this, and the

13   government can argue all this if you let it in.  We're arguing

14   that this should be excluded because it's irrelevant as to

15   what Mr. Ragano knew that these other two individuals were

16   doing.

17          Again, they were behind him.  There's nothing in the

18   recording of which they said anything threatening, or that Mr.

19   Ragano said anything in reference to these two individuals.

20   So I think it's incumbent upon the Court to make a ruling on

21   how this is relevant, not whether or not we can cross-examine

22   on it.

23          THE COURT:  That's the background that I was laying

24   of why I think it is relevant.  I think it's relevant because

25   it was Ragano who wanted John Doe to show up at his place of

1  business, and I think it's reasonable to infer that one of the

2  reasons he wanted that was to be on home turf because he knew

3  that on home turf he had support there.

4              MR. STEIN:  I don't think that's a reasonable

5  argument at all to make, at all.

6              THE COURT:  Okay.  You have your objection.

7              MR. STEIN:  Okay.

8              THE COURT:  Is there some other theory that the

9  government wants to propound as to why evidence regarding the

10  co-worker's actions is relevant?

11              MR. REICH:  It's exactly as you explained it, Your

12  Honor.

13              MR. STEIN:  The reason that he, John Doe, went there

14  is because Mr. Ragano was working six days a week at this

15  place of business, including on Saturdays.  On Sundays, with

16  the Court's permission, he went to church, which I believe he

17  did just about every Sunday with his sister.

18              So the reason why there was a discussion about where

19  they could meet is because Mr. Ragano was otherwise not

20  available.  John Doe is not going to go to Mr. Ragano's

21  residence where he was residing with a family member in

22  another part of Long Island.

23              THE COURT:  That's all fine.  But that doesn't take

24  away from the inferences that I just laid out, the fact that

25  he worked X number of hours and that he told him to just show

1    up there, I don't see that taking away from the inferences

2    that I just laid out.

3            With respect to -- related to this, I do find that

4    John Doe's statements to law enforcement after he ran out of

5    the shop, that those are excited utterances.  I've listened to

6    that tape, that it was made, I think my counting on it was

7    within 40 seconds.  I can hear the tenor and tone of the voice

8    of John Doe, and I think those are clearly, certainly satisfy

9    the excited utterance.  I think they would also be permissible

10   to admit that under the present sense impression.  I don't

11   think I need to get there because I think there's no doubt

12   that they were excited utterances.

13           I think the final thing is statements by Mr. Ragano

14   in the holding cell related to his arrest of Alimena.  I think

15   that some of those statements go to his intent to cause fear,

16   or at least to give the impression of someone who is willing

17   to carry through on explicit or implicit threats of violence

18   as necessary for Counts 1 and 2.

19           I don't believe all five of them are, and I think

20   some are more prejudicial than probative.  So I think the ones

21   I'm going to permit on these reasons are the ones having to do

22   with that he had been in a holding cell many times before,

23   that he did not fear going to prison, and that he had used

24   violence against inmates who challenged him.

25           I don't think the other ones, never waiting in line

*Proceedings* 52

1    for the communal microwave, or telling others in the holding

2    cell to move over so he can take a nap, those seem petty to me

3    and on balance the first three are more than enough to make

4    the point about the defendant's ability to carry through on

5    threats or to give the impression that he was someone who

6    could carry through on extortionate threats.

7            Again, since the fact that he's in a holding cell,

8    given the evidence that's already coming in regarding that he

9    pled guilty, there's no question that he would have been

10   arrested as part of that guilty plea.  So I don't find that

11   that is unduly prejudicial.  Mr. Stein?

12           MR. STEIN:  Nothing, Judge.

13           THE COURT:  I think --

14           MR. STEIN:  I'm sorry, there is.  As to the part

15   that you're allowing in or you're considering allowing in

16   about his being used to being in jail, I'm paraphrasing, I'm

17   not sure how that demonstrates, or he's not afraid of going to

18   jail, how that affects anything having to do with collecting a

19   loan.

20           THE COURT:  Which one, that he had been in a holding

21   cell so many times before or that he didn't fear going to

22   prison?

23           MR. STEIN:  Didn't fear going to prison.  Actually,

24   both, for the same reason, Judge.

25           THE COURT:  I do think that maybe we are warped, but

1   I think the average individual would be afraid to go to

2   prison, unless they thought they knew how to handle themselves

3   in prison.

4          MR. STEIN:  My point --

5          THE COURT:  Hold on.  Hold on.  I'm rethinking my

6   decision.

7          MR. REICH:  Your Honor, there's another point I

8   could make, if it could be helpful, which is not only what

9   Your Honor just said about not being fearful of going to

10  prison because of the circumstances inside prison, but also

11  just not being fearful of committing crimes and, therefore,

12  going to prison.  Saying I'm not afraid to go back to jail is,

13  in essence, a threat that I'm not afraid to break the law.

14         THE COURT:  I don't know if I view it the same way.

15  I think it's more about sort of bravado.

16         MR. REICH:  We do think that John Doe will testify

17  that he interpreted it that way.

18         THE COURT:  Which way?

19         MR. REICH:  He interpreted it to mean that this was

20  an individual saying I'm not afraid to commit more crimes and

21  go back to jail.

22         MR. STEIN:  Judge, to use your phrase, although I

23  think we use it in our papers somewhere, what is the nexus

24  between collecting the loan?

25         THE COURT:  It goes to the threat element, that if

*Proceedings*                                                      54

1    you are someone who has the bravado that you have no fear of

2    being in prison, that certainly goes to creating an atmosphere

3    of prisons are -- if this was a sentencing right now, you

4    would tell me about how violence prisons are and someone who

5    is not afraid of that is presumably someone who is capable of

6    dealing with violence, whether by taking it or giving it.

7            I'm going to, in addition to the two that I said I

8    was going to preclude, I'm going to also preclude the one

9    about being in a holding cell many times before.  As I think

10   about it, and as Mr. Stein argued, there is a chance that that

11   might go too much to propensity.  But I do think that not

12   having the fear to go to prison and using violence, that he's

13   used violence against inmates who challenged him, that there's

14   no number of times associated with that.  So there isn't the

15   possibility that the jury would think oh, this guy has been in

16   prison 20 times.

17           So I'm only going to allow those two in, to be

18   clear.  So it's the one that he did not fear going to prison

19   and that he had used violence against inmates who challenged

20   him.  The other ones I'm excluding, which means that to the

21   extent the government needs to examine John Doe in a leading

22   fashion in order to elicit just those two statements, I give

23   you leeway to do that so that we don't run the risk that he'll

24   say other things that he heard while in a holding cell.

25           MS. LASH:  We understand, Your Honor.  I'll note,

*Proceedings*                                                    55

1   just for the record, that the comment about not waiting in

2   line for the microwave related to his use of violence against

3   inmates, or at least John Doe would testify that he understood

4   he didn't wait in line for the microwave because he would use

5   violence if someone challenged him.

6               THE COURT:  If you need the microwave with what you

7   believe is going to come out about Mr. Ragano, then I don't

8   think we have -- if that's what's going to tip the scale on

9   whether the jury believes that Ragano is willing to use

10  violence, then I'm willing to take that risk from an

11  evidentiary perspective.  I just think that's more than

12  enough.

13              MS. LASH:  We understand.  I'm just providing that

14  microwave context for the Court and the defense's knowledge.

15              THE COURT:  Like I said, given my ruling there, you

16  do need to make sure that the witness does not step into those

17  other statements.  I know I've kept you.  If we could just

18  wrap this up in about 10 minutes.

19              MR. STEIN:  Judge, there are some other things we

20  wanted to bring up.

21              THE COURT:  Let's do logistics so I know I get that

22  out of the way.  We're going to start jury selection on the

23  seventh.  My thought, given the time estimate for the -- let

24  me be clear.  Anything else on in limine?

25              MR. REICH:  Yes, Your Honor.  We have a couple items

*Proceedings*                                                                    56

1    we want to raise on in limine.

2           THE COURT:  That were briefed and I failed to

3    address them?

4           MR. REICH:  There's a couple that the government

5    mentioned in its motion, yes, Your Honor.

6           THE COURT:  Okay.

7           MR. REICH:  There was a note in the government's

8    motion in the discussion of the marijuana scheme and the

9    importance of that particular scheme to provide context to the

10   current conduct.  There was a note about a similar scheme

11   involving the fake OSHA certifications.

12          The government would move to be able to discuss the

13   OSHA scheme as well for the same reasons why it was important

14   to discuss the marijuana scheme.  This is a scheme that

15   individual one was involved with Mr. Ragano.  This was a

16   scheme --

17          THE COURT:  Was John Doe involved?

18          MR. REICH:  John Doe was not involved in that

19   scheme.

20          THE COURT:  I'm not going to allow it.  Look, I

21   mean, the threat tent is a big tent but it's not limitless.

22          MR. REICH:  We don't expect that that really has

23   anything to do with the threats, Your Honor.  Part of it is

24   individual one met Mr. Ragano in the context of working at the

25   OSHA school.  And so he began teaching classes for Mr. Ragano

*Proceedings*                                                        57

1    at the OSHA school.  He ultimately was asked to start doing

2    these false OSHA certifications.

3              THE COURT:  Unless the defense opens the door by

4    examining him on that, then I give you license to not elicit

5    that from him as a prior bad act with the understanding that

6    the defendant is not going to go into it.

7              If the defense goes into it, then --

8              MR. REICH:  We are going to -- individual one did

9    plead guilty to a number of crimes and the OSHA scheme was one

10   of them.  We did intend to go into that.

11             THE COURT:  Does the defense intend to cross

12   individual one on the OSHA scheme?  I can see you just

13   eliciting that he did this with others without having to get

14   out that Ragano was part of it, but if the defense is going to

15   cross-examine him on some aspect of that because it shows oh,

16   you know, you were willing to create, you know, public danger,

17   these OSHA certifications are really important, and to not --

18   and to play games with that, that really goes to the public

19   well-being and you're a heartless individual, that would then

20   open the door to bring Ragano into that scheme.

21             MR. STEIN:  Judge, we don't have any such plan.  To

22   the extent that it comes up, it's relevant to individual

23   number one's credibility because this was a fraudulent scheme

24   which by its nature relates to individual number one's

25   credibility.  That's the extent to which we intend to explore

*Proceedings*                                                    58

1   it.

2          As far as I'm concerned, Mr. Ragano's name doesn't

3   have to be mentioned at all.  In terms of the OSHA scheme, the

4   individual number one is going to admit that he pleaded guilty

5   to this and that it involved fraudulent conduct, which relates

6   to his credibility.

7          THE COURT:  I don't see why Ragano's role in that is

8   relevant for rehabilitation purposes.

9          MR. REICH:  I think in a couple of ways, Your Honor.

10  First, to leave the jury with the impression that individual

11  one is not believable or doesn't come to this with clean hands

12  because he perpetrated the OSHA scheme without being aware

13  that Mr. Ragano instructed him to perpetrate the OSHA scheme,

14  I believe would leave the jury with a misimpression of the

15  nature of the relationship between individual one and Mr.

16  Ragano.

17         Mr. Ragano instructed individual one to be the

18  go-between in the loan collection, only after he created this

19  environment of trust where he instructed individual one to do

20  the fake OSHA certifications.  That really lays the groundwork

21  for how individual one and the defendant came to start

22  committing crimes together.  The OSHA scheme is really one of

23  the very first things that individual one does for Mr. Ragano,

24  setting the backdrop for what he ultimately does that's

25  relevant to the loan.

1          And, obviously, the OSHA scheme was executed while

2    individual one was working at the OSHA school for Mr. Ragano.

3    There's going to be a lot of discussion of his time at the

4    OSHA school for Mr. Ragano, how he observed Mr. Ragano, the

5    way Mr. Ragano conducted himself and discussed things, and

6    some of the evidence that we alluded to earlier, Your Honor.

7          THE COURT:  Where is this in your papers?

8          MR. REICH:  Your Honor, in the -- Your Honor, we

9    alluded to it on page 30, footnote 30, and admittedly, Your

10   Honor, we did not expand on it at that time.  But this is

11   something that has come to light as we prepared for trial and

12   prepared with individual one for trial.  So that's why I

13   wanted to raise it for Your Honor.

14         THE COURT:  I'll sort of revisit this based on the

15   nature of the cross-examination, but I mean it just strikes me

16   that if it becomes a significant portion of the cross of this

17   individual, then I think it's fair game to -- at that point,

18   then, the instruction that I would give the jury, if I do

19   think that, is that I have precluded the government from going

20   into this in direct so that there's not an impression that the

21   government was somehow trying to limit that witness'

22   testimony.

23         So if it's a limited cross on this topic, then I

24   don't believe -- I don't see a need to implicate Mr. Ragano in

25   it.  If it becomes a larger theme of the cross and I find that

*Proceedings*                                                    60

1    it does open the door, then I will instruct the jury that the

2    government -- that I had not permitted the government to deal

3    with that topic on its direct but that in light of the

4    cross-examination, I'm now allowing the government to elicit

5    that testimony.

6              MR. STEIN:  Understood, Judge.  As I said before, my

7    intention is to limit it to impeaching individual one's

8    credibility because he engaged in fraudulent conduct, which is

9    inherently dishonest, period.

10             THE COURT:  To the government, I mean footnote six,

11   there are two sentences there.  One links Ragano to the

12   business but doesn't link Ragano to individual one's

13   fraudulent scheme.  What did Ragano plead to in front of me?

14             MS. LASH:  He pled to false identification documents

15   in connection to the OSHA scheme and to extortionate

16   collection of credit conspiracy.

17             Understood, Your Honor.  So the Court and defense

18   knows, how we expect this will come out in trial is individual

19   one will testify about his relationship with the defendant,

20   mostly through the course of seeing him multiple times a week

21   at the OSHA school, comments that he made to him, and then he

22   will later testify that he pled guilty to making fraudulent

23   OSHA certifications.

24             If he's asked on cross-examination and discussed

25   about his credibility in connection to those, I expect he will

*Proceedings*                                                               61

1   say he did it at the direction of John Ragano.  So I want to

2   flag that for the Court and counsel before we walk into that,

3   which is why we think it's a little simpler to do it in a

4   measured fashion during individual one's direct, but we can

5   see how it plays out.

6          MR. WOMBLE:  Yes, Your Honor.  Ken Womble for Mr.

7   Ragano.  I think what Your Honor said about the tent being not

8   without limits, what we've been discussing so much at this

9   conference is conduct that occurred in 2021 that was part of

10  the Alimena case.

11         And while we recognize the government's theory that

12  the context from that is relevant to the charges here, if the

13  government and, again, we're kind of flying blind, we haven't

14  seen 3500 material.  So a lot of these arguments that we've

15  had to make are being made in the abstract without reference

16  to specific evidence.

17         But if the government is going to be able to provide

18  evidence that individual one was, indeed, the go-between for

19  Mr. Ragano and John Doe in the, I guess, the original --

20  because there is a temporal break here of I believe a year and

21  a half or so between the Alimena case and when contact was

22  resumed between John Doe and Mr. Ragano.

23         If the government is talking about having to provide

24  context for the relationship, it would seem that if they can

25  provide evidence that establishes that individual one was the

1   go-between for the loan between Mr. Ragano and John Doe, it

2   doesn't really seem like there needs to be this fulsome, I saw

3   him do this at the OSHA school, I saw him do this at the OSHA

4   school.  It really that tent.

5           THE COURT:  Right now I certainly have not ruled

6   that the OSHA portion of his guilty plea.  The only portion of

7   his guilty plea that I was thinking about and that I said is

8   admissible has to do with the extortionate scheme, with the

9   extortion scheme, not the OSHA.

10          So the fact that individual one may testify that he

11  spent time with Ragano at this OSHA place, unless it comes out

12  somehow, there is no evidence that Ragano was implicated in

13  the OSHA scheme, as well.

14          However, as the government just noted, questions

15  that you asked him, individual one, may open the door to that.

16  You're on notice of that and if he says something like yeah,

17  and John was all over me to do that, then you're stuck with

18  that answer.

19          MR. WOMBLE:  Of course.  That's completely

20  understood.  It's just to provide context from our point of

21  view, and Your Honor referenced this earlier, is that the

22  communications between individual one to John Doe are really

23  the critical nexus and connective thread.

24          While that does allow for certain evidence to, I

25  guess, support that individual one presumably has a basis for

1  saying those things, to continue to kind of -- to spend what

2  appears to be a fairly significant portion of the trial in

3  2021.

4          THE COURT:  The government should be allowed, and it

5  will be allowed, to establish the nature and the bona fides of

6  the relationship between individual one and Mr. Ragano,

7  because since individual one was functioning as a conduit, as

8  alleged, for the loan, it's important from an evidentiary

9  perspective to establish why there was that level of trust

10 between individual one and the defendant.

11         MR. WOMBLE:  Just to put a period on this, from our

12 perspective we do see that there is a -- this is a difficult

13 case to kind of wrap one's head around because it is a

14 continuation of another case.  That being said, that original

15 case was dealt with with a guilty plea.  There was a break,

16 and while there is contextual threads that connect these two,

17 we just want to --

18         THE COURT:  There was a temporal break but there was

19 never a -- this not a new loan.

20         MR. WOMBLE:  I believe that that's correct.

21         THE COURT:  As alleged.  I know less than you do.

22         MR. WOMBLE:  Just to make sure that when there is

23 all of this evidence from individual one about 2021, and that

24 is firmly within the Alimena case, that the communications to

25 John Doe that occurred at that time within the structures of

*Proceedings*                                                                 64

 1   the Alimena case to then kind of provide context for what

 2   happens later, the government hasn't charged back to that

 3   point and so that --

 4            THE COURT:  My expectation is that the government

 5   will lay the amount of evidence that it believes is necessary

 6   to establish the nature of the relationship between individual

 7   one and the defendant, and then move on from there.  That's

 8   not going to be -- that's not going to be the sum total of the

 9   testimony.

10            Certainly it's a portion of the testimony but I

11   assume there are other things that John Doe, not John Doe,

12   that individual number one is going to say.

13            Any other motion?

14            MR. REICH:  One last one, Your Honor.  This is at

15   page 26, footnote 5.  The government discusses some of the

16   items that were found on the defendant's phone that was

17   monitored by pretrial services.

18            THE COURT:  My internal note to myself on this

19   footnote is shouldn't the parties be able to stipulate to some

20   of this, as opposed to just having to -- why don't the parties

21   meet and confer on this one, since the defendant did not

22   affirmatively address this point.  So I don't want to just

23   give a ruling without their response to it.  Why don't you

24   meet and confer with it.

25            MR. WOMBLE:  Your Honor, if I could briefly respond

1    but also ask a question.  What I assume is that the government

2    intends to provide this in the context of John Ragano looking

3    at articles about himself.

4              THE COURT:  Part of 849 is the defendant's own sort

5    of knowledge about how he is perceived under 849.

6              MR. WOMBLE:  Yes.  I think in the context of -- I

7    don't know if I have had a federal client who has not gone on

8    to Google or had articles sent to him or her in the context of

9    their case.

10             So I do want to kind of bring up that it might be

11   worthwhile consider avoiding -- while the government is saying

12   this provides him with this information, then we're at a loss

13   to point out that this is incredibly common behavior by a

14   criminal defendant.

15             THE COURT:  Before I am compelled to rule, I'm

16   asking the parties to see if there is a sanitized version of

17   footnote five that could be stipulated to.  Since I'm already

18   allowing evidence about, for example, his association with

19   organized crime, I can envision a stipulation that speaks to

20   following his arrest, if called to testify, blah, blah, blah

21   would testify that on his phone were images or internet

22   searches regarding allegations of the defendant's involvement

23   with organized crime, or something sanitized, but that gives

24   the gist of the items that were on the phone.

25             MS. LASH:  Understood, Your Honor.  The parties will

*Proceedings*                                                    66

1   discuss it.  Thank you.

2          THE COURT:  Just a word to the wise, footnotes are

3   not the place to put substantive applications.

4          MR. REICH:  Completely understood, Your Honor.

5   Thank you.

6          THE COURT:  That was my note on that one.  Let's

7   turn to logistics.  Like I said, start on the seventh.  I

8   don't believe we need more than two alternates.  Does anyone

9   view it differently?

10         MS. LASH:  No.

11         THE COURT:  So the way I do jury selection, then, is

12  we need to get to a qualified panel of 32.  That's 12 jurors,

13  6 peremptories for the government, 10 peremptories for the

14  defense.  That's 28.  Then we need to deal with our

15  alternates, so two alternates.  That's 30.  And then each side

16  gets an alternate peremptory since we're doing two or less.

17  Do the parties agree to that math?

18         MS. LASH:  Yes, Your Honor.

19         MR. STEIN:  Yes, Judge.

20         THE COURT:  Any issue with having two alternates?

21         MR. STEIN:  No.

22         MS. LASH:  None from the government.

23         THE COURT:  The way I do the jury selection is I've

24  gotten your proposed voir dire questions.  I'll create my own

25  set, and what I do is I bring in the entire venire.  Let's say

*Proceedings*                                                              67

1  my voir dire questions are 25 questions, I'm just making that

2  up, but that's roughly what it will be.  Each juror will have

3  a number that's associated with them.  And then I'll ask

4  questions in a way that are intended to elicit an affirmative

5  response.

6          So do you or any close family members work in

7  law enforcement, and by law enforcement I mean the FBI,

8  whatever my description is.  If eight individuals raise their

9  number, I have them keep their numbers up.  I call them out so

10 that the reporter can get them, but also so that you have

11 them, and we go through all those 25 questions.

12         Then what I do is I bring in each juror

13 individually.  So it's the rare individual who doesn't raise

14 their number, but even if they didn't raise their number to

15 any of those questions I still bring them in.  Bring them in,

16 put them in that first seat in the jury box.

17         I go through my notes and I see, oh, Juror 18, I see

18 that you answered yes to question five about law enforcement,

19 who is in law enforcement.  I go through to give you enough

20 information to decide whether you want to make a cause

21 application.

22         Once I've gone through those questions where he or

23 she has raised their number, then I also will ask about ten

24 basic pedigree questions in order to allow you to have more

25 information for purposes of peremptories.  So what

*Proceedings*                                                                68

1   neighborhood do you live in, own or rent, sources of news,

2   other adults in your household, what do they do for a living,

3   those kind of questions.

4            And then once I've gone through the questions, I'll

5   ask that juror to just step outside in the hall for a second.

6   Mr. Neptune will take them there and wait.  I'll ask the

7   parties if there's any cause basis.  If there isn't, that then

8   is a qualified juror and we keep doing that until we get to

9   32.

10           Once we get to 32, depending on what time of day it

11  is, whatever, you will then have your qualified panel.  I'll

12  give you a sheet, each of you a sheet to exercise your

13  peremptories on.  You'll do your peremptories simultaneously

14  and blind to each other.  The government will have a sheet

15  with six lines on one side and one on the other for its

16  alternate, and the defense will have a sheet with ten boxes on

17  one side and one box on the other for the alternate.

18           You then for your 6 and 10 peremptories for your

19  main panel, you should only exercise those up through a juror

20  slotted in the 28th slot.  And then for your peremptory for

21  your alternate, you should only exercise that with respect to

22  the jurors slotted into numbers 29 through 32.

23           You'll hand those up.  If there is overlap in the

24  peremptories of the initial panel, let's say you overlapped on

25  one of them, meaning that there's one left over juror in slots

*Proceedings* 69

1 | 1 through 28, that individual will be dismissed and your

2 | lowest 12 numbers will be your 12 main jury.

3 | We'll do the same exercise with the alternates.  And

4 | your lowest two, even if you exercised -- let's say you

5 | decided to strike the same alternate and it's number 31, then

6 | numbers 29 and 30 will be your alternates.

7 | Any questions about that process?

8 | MR. STEIN:  Judge, I don't have any questions about

9 | that process.  I have a question about one of the subjects

10 | that you touched on when you said you would ask, which I

11 | assume most, if not all judges would ask, about their sources

12 | of news.

13 | In this particular case there has been some

14 | reporting of it publicly and it's been covered to some extent.

15 | THE COURT:  That's going to be in my cause

16 | questions, not in my pedigree questions.

17 | MR. STEIN:  I don't want this to come out in the

18 | presence of jury selection.  So there's been some reporting of

19 | this in Gangland News.  So I don't want any prospective juror

20 | to know that this particular case has been reported in

21 | Gangland News, which, perhaps, has its own connotation.

22 | THE COURT:  My question is going to be a generic

23 | question about is anyone aware of this case, have they seen it

24 | in any -- I'm going to ask a blanket awareness of the case, as

25 | opposed to making any reference to it having been picked up by

*Proceedings*                                                              70

1   the news.

2          MR. STEIN:  I just want to make sure for anybody who

3   actually reads that, that they're not going to say I read

4   about this in Gangland News in front of all the prospective

5   jurors.

6          THE COURT:  No, no, no.  The initial process is just

7   hold up your number so that I can jot down that you answered

8   affirmatively to a question, and then it's only going to be in

9   here one on one without anyone else.  So there will be no

10  spillover.

11         MR. STEIN:  So the rest of the panel will be out in

12  the hallway?

13         THE COURT:  In the hallway or across if that

14  courtroom is empty.

15         MR. STEIN:  Understood, Judge.

16         THE COURT:  That's it for jury selection.  Any

17  questions about that process?

18         MS. LASH:  No, Your Honor.

19         THE COURT:  For trial logistics, I think what I'm

20  going to tell the jury is that the trial is expected to last

21  about a week, but obviously that depends on deliberations, but

22  at a minimum a week.  That way if someone has something

23  Monday, the 15th, Monday, the 14th, that's a holiday.  Let's

24  say they're going away and not coming back until the middle of

25  that week, that might be a basis to excuse that juror for

*Proceedings*                                                          71

1  cause just on the outside chance that we spillover.

2          In terms of the schedule, my normal day would be

3  start -- I'd like to have the jury, if they're here, ready to

4  go by 9:30.  I don't think that -- I'm not going to expect the

5  government to have any witnesses on that Monday.  I just think

6  it's going to take, even if it goes quickly just to qualify

7  32, it just takes a while.  I'm hoping we can do it in the

8  day.  You never know.

9          So the parties should be expected to, and I'm not

10  going to force you to cram your openings at 4:00 or something.

11  So if we're done at 4:00 with jury selection, we'll start the

12  trial day on Tuesday morning.  Obviously we can talk on that

13  Monday if it looks like we're not going to have a jury until

14  Tuesday morning.  But for purposes of that Monday, no

15  expectation of jury address or witnesses.

16          My normal day is 9:30 to 5:30.  Actually on that

17  Monday, I need to leave by 5:00 because I teach a class.  So

18  that will only affect that one Monday.  Then Tuesday, the

19  eighth, let's go 9:30 to 5:30; Wednesday, the 9th, 9:30 to

20  5:30; Thursday, the 10th, start at 9:30 but that's the day of

21  someone's investiture at 4:00 that day, unless it's too huge

22  an inconvenience to the parties I'd like to attend, but let's

23  play that by ear.  And Friday the 11th, that evening, is Yom

24  Kippur.  So we'll go 9:30 to 1:30 that day.

25          To the extent the trial needs to go into the next

*Proceedings*                                                72

1  week, like Mr. Stein noted, Monday is a holiday, the 14th.  So

2  we'll pick it up again on the 15th, from 9:30 on.  In terms of

3  breaks, pretty standard.  I take a morning break, afternoon

4  break, and a lunch break around 1:00.  If there's a natural

5  break at 12:30 and the next witness is going to be a lengthy

6  witness or 12:45, we can think about lunch then.

7          MR. STEIN:  Judge, so during the morning before the

8  lunch break you do take a break?

9          THE COURT:  I'll take one break.

10          MR. STEIN:  And in the afternoon, as well?

11          THE COURT:  Same.  Another mid-afternoon break.

12  With respect to trial materials, if converted to paper, how

13  much paper does the government expect so I can decide whether

14  I want a paper set?

15          MS. LASH:  Your Honor, with respect to the

16  witnesses, the fact witnesses that we expect to testify, with

17  the exception of individual one, I think the paper portion of

18  that is confined enough that we can provide binders that would

19  not be overwhelming.

20          THE COURT:  I just need two sets, one for me and one

21  for Mr. Neptune and my clerk.

22          MS. LASH:  In connection with individual one, he

23  obviously has statements that were gathered by the government

24  in the prosecution of the Alimena case that we intend to

25  specify to the defense, although we wouldn't intend to print

*Proceedings*                                                    73

1   because that would be a really voluminous set of paper and

2   also most of it is actually audio recordings.

3           So as to him, we'd ask that we can just provide a

4   list of the materials from Alimena or separately on a hard

5   drive.

6           THE COURT:  That's fine.  Yes.  Obviously if there

7   are any other audio visual things, just make sure -- I know

8   you've tried a case in this courtroom, Ms. Lash, but if

9   there's anything else, just coordinate with Mr. Neptune in

10  terms of making sure we have whatever we need.

11          Like I said with respect to the jury charge, my goal

12  is to get you at least my initial draft by that Friday, the

13  fourth at the latest.  We can talk about when to have the

14  charge conference, but it will probably be -- obviously it

15  will depend on how quickly the evidence comes in, but it will

16  be maybe as early as that Tuesday in the evening, depending on

17  when we break.  And the way I do my charge conference is the

18  government will go first and tell me first page that they have

19  some comment on, and then I'll turn to the defense.  So if

20  they say Your Honor on page 10, I'll turn to you, Mr. Stein

21  and Mr. Womble, and say do you have anything before page 10.

22  If you do, we'll go there.  If not, we go to page 10.  And we

23  keep going until we get to the end of the charge.

24          MR. STEIN:  I'm sorry, Judge.  When do you

25  anticipate the charge conference?

*Proceedings*                                                                  74

1        THE COURT:  Maybe as early as Tuesday evening.  My

2   plan would be if we broke around, depending on the witness, if

3   we broke around 5:00 that day or 5:15, we'd stay here.

4   Obviously I know by keeping your client it needs to -- it will

5   hold up the entire bus, but it will depend on how much we have

6   to cover in the charge conference.  Sometimes you can do a

7   charge conference in 30 minutes.  Sometimes you need

8   two-and-a-half hours.  It will depend.  At a minimum we might

9   just start and get moving on it.

10       MR. STEIN:  So we should have the charge conference

11  you're estimating -- I'm sorry.  We should have the draft of

12  the charge on Friday, the fourth?

13       THE COURT:  That is my goal to get it to you so at

14  least you have it over the weekend.  I think that's all I have

15  for logistics.  Anything else from either party?  From the

16  government?

17       MS. LASH:  No, Your Honor.

18       THE COURT:  Mr. Stein?

19       MR. STEIN:  Yes, Judge.  I don't know if you wanted

20  to take a break.

21       THE COURT:  How long?  Is it going to be a long

22  question?  We can take a break if you want.

23       MR. STEIN:  A couple of points.  It's not for my

24  benefit.  It's court personnel.

25       THE COURT:  Let's be back at 20 after.

1             (Recess taken.)

2             MR. STEIN:  Judge, under the schedule you set up,

3    the exhibits are scheduled to be produced September 30th?

4             THE COURT:  Government exhibits and exhibit list,

5    September 30th, yes.

6             MR. STEIN:  There's a week there where we have an

7    opportunity to object to exhibits.  And I had a recent

8    discussion with Ms. Lash about this, how it's going to be

9    dealt with because with that one week window it doesn't give

10   us a lot of time, frankly.

11            I don't know how many exhibits there are going to

12   be.  Obviously there's the recordings, but there's some

13   specific exhibits that I've already discussed with Ms. Lash

14   about how to deal with this.  I think we need some opportunity

15   to deal with that in advance of the 30th.

16            Just by way of example, Judge.  They sent us

17   originally a redacted form of text messages going back to

18   2021.  Then the government agreed to unredact them, the text

19   messages, to some extent and there are text messages, just to

20   generically characterize them, having to do with the issuance

21   of a loan to begin with.  So they're all 2021.

22            Some of them are with John Doe, some of them are

23   with Mr. Ragano, some of them are with an individual who was

24   charged in the original Alimena case.  There's a question as

25   to whether or not these are relevant at all.  So I'm not here

*Proceedings*                                                                76

1  to argue that now at all, but it seems we need some

2  opportunity more than just that week when we'll be pretty

3  busy.

4          MS. LASH:  If I could be heard, Your Honor.

5          THE COURT:  Yes.

6          MS. LASH:  I think, as I told Mr. Stein and Mr.

7  Womble, those messages were produced in discovery in a letter

8  that said these are produced to you under Rule 16 and pursuant

9  to early 3500 disclosure so they would have them.  I don't

10  think the government has necessarily decided that those

11  messages will be marked as exhibits.  I understand that that's

12  just an example of a category that Mr. Stein and Mr. Womble

13  may want to file objections to.

14          What I hear him saying now, which I didn't

15  understand to be the case before, is that a week is not enough

16  time for him to object to exhibits here.  Now, I want to say

17  that when we discussed the schedule, we had initially foresaw

18  producing exhibits earlier to deal with that time.  And Mr.

19  Stein and Mr. Womble asked us to instead produce the 3500

20  earlier.  So the schedule is partially in relation to what

21  they have requested.

22          I think putting that side, a week is plenty of time.

23  There are not voluminous exhibits in this case.  As Mr. Stein

24  noted, the audio will certainly be marked as government's

25  exhibits, as well as materials that we've produced in Rule 16

*Proceedings*                                                                77

1  discovery, which they have.  There's been a limited number of

2  productions and it's not that much.

3          THE COURT:  Can I interrupt you?  With respect to

4  the audio, I assume it's all -- it's items that we've dealt

5  with in the two hours that we've just dealt with in limine

6  motions.

7          MS. LASH:  Yes.  There's nothing except for the

8  audio that we've been discussing since the start of the case

9  here.  So that said, first of all, I don't think that there's

10 that much to review and a week is plenty of time.  If they

11 have objections to exhibits on relevance grounds, we can deal

12 with that in a week.

13         THE COURT:  And you produced that list on the 27th?

14         MS. LASH:  The list of exhibits?

15         THE COURT:  Yes.  Instead of the 30th.  It's that

16 Friday.

17         MS. LASH:  Thank you, Your Honor.  I think with the

18 Court's permission we could certainly produce many of the

19 exhibits on Friday.

20         THE COURT:  Why don't we do that.  Why don't you

21 make a good faith effort to produce some portion of the

22 exhibit list that's more written in stone by that point, based

23 on your trial prep, and then the remainder of it by the 30th.

24         MR. STEIN:  Judge, let me add.  Ms. Lash is correct

25 about we had agreed to the schedule.  For whatever it's worth,

1   frankly, I didn't anticipate that we would be objecting to

2   exhibits until these text messages started getting produced.

3   Originally I think it was early in August and the less

4   redacted version of them afterwards.  So I didn't anticipate

5   this would be an issue.

6              THE COURT:  What we're talking about here is

7   relevance.  I think if you get me a chart with a description

8   of what the thing is and not relevant because, like I don't

9   need a lot of briefing on a relevance objection.

10             So if you want to put it in a chart for me and give

11  me a couple of lines of why you think it's not relevant, I can

12  rule on those as we go.

13             MR. STEIN:  That's fine, Judge.

14             THE COURT:  Anything else?

15             MR. STEIN:  Yes, Judge.  So back in February I

16  brought to the Court's attention Mr. Ragano's medical issues,

17  and you had directed or asked us to confer with each other

18  before we brought it to the Court's attention.

19             So I don't know whether the incident yesterday at

20  the jail has anything to do with this, I suspect it might, but

21  in any event, as Your Honor may recall from the sentencing of

22  Mr. Ragano in the Alimena case, as well as Judge Ross' order

23  that he be released immediately because of the jail dealing

24  with his medical issues.  So for several months now, Mr.

25  Ragano has been telling me and Mr. Womble about the lack of

*Proceedings*                                                    79

1    treatment that he's getting, and it's a serious problem.

2            As Your Honor may recall originally from the

3    sentencing, maybe not, according to the MDC's doctors he was

4    literally in danger of going blind in the only remaining

5    eyesight that he has in one eye.  And that was a factor I

6    assume the Court considered in sentencing back sometime last

7    year.

8            So Mr. Ragano, I always ask him how are you doing,

9    John, what's happening with your condition.  He's been telling

10   me for some months now about the lack of medical attention

11   he's been getting.  He has about five or six prescription

12   eyedrops and he's experiencing a lot of pain to the point that

13   he's having difficulty sleeping.

14           I don't know whether the accident that happened at

15   the jail yesterday had anything to do with his vision.  It's

16   certainly possible.  This is just an ongoing concern.  I'm

17   raising it at this point because it's just continuing on

18   without any appropriate attention.  At one point some months

19   ago he was taken to an outside doctor to see an

20   ophthalmologist, who advised Mr. Ragano in so many words that

21   he may need surgery.

22           So whenever we speak to him, we ask him what's

23   happening with seeing the outside ophthalmologist.  He puts in

24   numerous requests and he hears nothing and I don't want this

25   to be a problem at the trial when I have a client in pain.

*Proceedings*                                                                 80

1   It's not right, frankly.

2          THE COURT:  I'll give the government an opportunity

3   to reach out to the MDC.  When was the last time you raised

4   this with the government?

5          MR. STEIN:  Friday.  Friday because we spoke with

6   Mr. Ragano that morning in a legal call from the jail, and

7   I've asked him to be able to document the times that he's put

8   in a request for medical attention.  I don't know what he's

9   done to cumulate the document, the requests he's put in.  It's

10  just a problem and it's not right.

11         THE COURT:  All right.  I agree.  If he's not

12  getting the necessary medical treatment, of course it's not

13  right.  If the government can look into this starting today

14  and get me a letter either by the end of the day on Wednesday

15  or at some point on Thursday, so Wednesday or Thursday,

16  Thursday at the latest, letting me know what medical

17  treatments the defendant has requested and, in particular, the

18  eye care issue and what the current status of that is based on

19  the medical staff at MDC.

20         MR. STEIN:  Judge, in light of your projection that

21  we may not start taking testimony until Tuesday morning, it's

22  possible the problem I raised earlier about family members

23  being able to attend may become academic.  I don't know

24  whether they'd be here during jury selection, frankly.  I

25  thought we might be starting testimony that afternoon.

*Proceedings*                                                    81

1      THE COURT:  We'll start testimony the Tuesday

2  whenever we have a jury.  So assuming we have a jury Monday,

3  we'll start -- nothing will happen on Monday, other than jury

4  selection is the easiest way to say that.  Anything else?

5      MR. STEIN:  No, Judge.

6      THE COURT:  All right.  Anything from the

7  government?

8      MS. LASH:  No, Your Honor.  Thank you.

9      THE COURT:  I think time is excluded on this case

10  through the trial date?

11      MS. LASH:  It is, Your Honor.

12      THE COURT:  So thank you all, and obviously if you

13  need any -- you'll put in a letter regardless of what the

14  status is with the medical treatment, and if there's more that

15  I need to do in that respect, let me know.  So to the extent

16  you can make that a joint letter and coordinate, and if

17  there's some relief that you need, if you could put it in that

18  letter.

19      MR. STEIN:  Judge, maybe it would be helpful --

20  since my client is not here, he's not in a position to sign a

21  HIPAA authorization.  I don't know whether the government can

22  obtain the records from the jail on their own and send it to

23  us.

24      THE COURT:  I'm not expecting the government to do a

25  review.  If they need to, they can do whatever they want.  I

*Proceedings*                                                      82

1   wasn't expecting the government to do a review of medical

2   records, but rather to get a report from the counsel's office

3   at the MDC that looks into requested medical treatment and

4   what the plan is for treatment, and in particular the

5   treatment of the eye condition.  That seems to be the driving

6   concern.

7               MR. STEIN:  Okay.

8               THE COURT:  Obviously, you'll coordinate if there

9   are release issues.  You can file that letter under seal,

10  given that it will discuss medical conditions.

11              MS. LASH:  Thank you, Your Honor.

12              THE COURT:  Thank you.

13                  (Proceedings concluded at 1:32 p.m.)

14          -  -  -  -  -  -  -  -  -  -  -  -  -  -  -

15              I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
16  */S/ Nicole Sesta, RMR, CRR*
    *Court Reporter/Transcriber*
17
    *September 15, 2024*
18

19

20

21

22

23

24

25